UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO. 5:03-CR-39-R

UNITES STATES OF AMERICA                                        PLAINTIFF

v.

HONEY LYNN WOLFE                                                 DEFENDANT

**MEMORANDUM OPINION**

Honey Lynn Wolfe is before this Court on the charge of murder.  The prosecution intends to call Dr. Betty Spivack as its expert witness to testify that murder is a viable cause of death of the alleged victim.  Defendant brings her expert witness, Dr. Janice Jean Ophoven, to challenge that Dr. Betty Spivack's testimony is not appropriately based in scientific knowledge.  Defendant filed a Motion to Exclude Spivack's Expert Testimony (Docket #71).  The.prosecution responded (Docket #76).  Defendant moved for a Hearing Pursuant to *Daubert* to determine the reliability of Dr. Spivack's testimony (Docket #113), and the prosecution responded (Docket #116).  The Court granted the hearing (Docket #121), which was held on October 12, 2006.  Hon. James R. Lesousky, Jr., and Hon. Michael A. Bennett appeared for the United States.  Hon. Jamie L. Haworth and Hon. Laura R. Wyrosdick appeared on behalf of the Defendant.  Dena Legg served as Court Reporter.  The matter is now ripe for decision.

**BACKGROUND**

Defendant is indicted for the murder of three-month-old Brayden J. Grover, who was in the care of Defendant at the time of his death.  The prosecution claims that the infant died of asphyxia from the Defendant intentionally pressing the infant's face into his bedclothes until he

died because the infant would not stop crying. The prosecution bases its claims on the position of the infant in the crib at the time of death, the fact that the infant's entire body was swaddled very tightly, that the infant had a comforter folded three times over his head at the time of death, an alleged confession of the Defendant elicited after an extended period of interrogation, and Dr. Spivack's testimony that the infant died a significant time before the Defendant called for medical help. Specifically, Dr. Spivack noted that, in her opinion, the infant had been dead for between twenty minutes and an hour before being repositioned onto his back. Then, according to Dr. Spivack, the infant was left on his back for approximately an hour before Defendant called for medical attention. In the alternative, the prosecution claims that the infant died of positional asphyxia as a result of the Defendant improperly placing the infant face down in his bassinet and swaddling him such that he could not move.

Dr. Spivack is a pediatrician who commonly works in the care and examination of both living and deceased children. She frequently observes and assists in autopsies of children. While Dr. Spivack never performs the autopsy or offers the sole medical opinion on the death, she generally serves as a consultant. Dr. Spivack was present at the autopsy of the infant in this case and formed her opinion at that time based on the appearance of the body and what she was told by the emergency medical technicians about the infant's condition and surroundings when they responded to Defendant's call. After examination, both Dr. Spivack and the performer of the autopsy concluded that the cause of death of the infant was "undetermined," meaning that multiple possible causes of death could not be ruled out. The prosecution uses Dr. Spivack's opinion to support their claims that intentional asphyxia, positional asphyxia, and asphyxia by rebreathing the same pocket of air are plausible causes of death for the infant.

The prosecution states that Dr. Spivack's intended testimony for trial will mirror her testimony at the grand jury proceeding indicting Defendant. In her testimony, Dr. Spivack says that SIDS, the cause of death of the infant propounded by the Defendant, may only be diagnosed if all other causes of death are excluded to a reasonable certainty. She concludes that other causes of death, such as intentional asphyxia, could not be excluded. Dr. Spivack also notes that the Center for Disease Control sets out a method for the diagnosis of SIDS which includes an autopsy, review of the child's medical records, and an investigation of the circumstances surrounding the death. While all three of the requirements were performed, the investigation of the surrounding circumstances showed that other causes of death might be possible, according to Dr. Spivack, and that a diagnosis of SIDS was improper. Dr. Spivack opined that the circumstances of the infant's death are consistent with either asphyxiation or SIDS. The Defendant's expert agrees that the Center for Disease Control set out the proper diagnosis procedure for SIDS.

Dr. Spivack based her conclusions not only on an investigation of the circumstances surrounding the death, but also on the coloring of the infant after his death. According to Dr. Spivack, this discoloration, called lividity or livor mortis, occurs pre- and post-mortem as the blood settles in certain parts of the body due to gravity. The prosecution and the Defendant agree that the reddish-purple coloring on the infant's front with pale spots on his nose, chest, and chin indicates that the infant likely died in a prone position, consistent with Defendant's testimony. Dr. Spivack says that this coloration is consistent not only with a death by SIDS, but a death by intentional asphyxiation, positional asphyxiation, or asphyxiation from rebreathing the same pocket of air.

Dr. Spivack also relies in part on some discoloration on the infant's back for her conclusion that the infant was repositioned after his death and left in that position for some time before medical help was called. According to Dr. Spivack, the emergency medical technicians indicated that the infant had lividity on his back when they first arrived. She concludes that this lividity is inconsistent with Defendant's assertion that the infant was repositioned on its back shortly before the emergency medical technicians arrived. Both Dr. Spivack and Dr. Ophoven state that lividity is an imprecise indicator of time or position of death because time of fixation of lividity varies widely between persons. They agree that lividity should be present to some degree on the infant's back since the infant was in a supine position during resuscitation attempts and post-mortem examination.

In support of her conclusions, Dr. Spivack cites several medical textbooks, extensive observation of autopsies, and lengthy experience in examining living and deceased children. Defendant's expert, Dr. Ophoven, does not contest that Dr. Spivack's literature is valid, but does suggest that it is not the best material on the subject. While Dr. Spivack does not contend that she is a licensed forensic pathologist competent to make the sole determination of death and perform and autopsy, she does submit that her experience and examination of the infant near the time of death make her competent to render an opinion regarding the cause of the infant's death. Because Defendant argues that Dr. Spivack uses unreliable or outdated methods and is not authorized to complete an autopsy or independently determine the official cause of death, Defendant seeks to exclude Dr. Spivack's testimony pursuant to FED. R. EVID. 702.

**STANDARD**

The admissibility of expert witness testimony is governed by FED. R. EVID. 104(a) and 702, applied under the rubric established in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Rules require that the Court ensure that any and all expert testimony or evidence "is not only relevant, but reliable." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 589). The Court must determine whether the expert

> is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Nelson*, 243 F.3d at 251 (quoting *Daubert*, 509 U.S. at 592-93). Testimony is "scientific" when "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." *Kumho Tire*, 526 U.S. at 152. The proposed testimony must be relevant, in that there must be a "valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592). In other words, there must be a "fit" between the proposed testimony and the question(s) presented by the case at bar. *Daubert*, 509 U.S. at 591.

*Daubert* outlined four factors under which to evaluate proffered expert testimony to ensure its reliability: "testing, peer review and publication, potential rate of error, and general acceptance in the relevant community." *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). However, these factors are "neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case." *Nelson*, 243 F.3d at 251. The Court "must

consider whether the factors are reasonable measures of reliability in a given case" before evaluating proffered expert testimony. *Id.* (citing *Kumho Tire*, 526 U.S. at 152). The proponent of the testimony "must establish its admissibility by a preponderance of proof." *Id.*

FED. R. EVID. 702 was amended to comport with *Daubert* by including the following language: "if (1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Advisory Committee Notes to this amendment "explain that no specific factors were articulated in the new rule because the factors mentioned in *Daubert* are neither exclusive, nor dispositive, and do not apply to every type of expert testimony." *Nelson*, 243 F.3d at 250 n.4. The Advisory Committee Notes do offer the following five factors as "relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact:"

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
> (3) Whether the expert has adequately accounted for alternative explanations;
> (4) Whether the expert is being careful as he would be in his regular professional work outside his paid litigation consulting; and
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*See* Advisory Committee Notes, FED. R. EVID. 702 (2000 Amendments) (citations omitted).

The Notes echo the requirement of flexibility outlined in *Kumho Tire*,[1] and indicate that "other factors may also be relevant" and "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Finally, the fact that the Court finds a particular expert is offering reliable testimony "does not necessarily mean that contradictory expert testimony is unreliable." FED. R. EVID. 702 Advisory Committee Notes. It is ultimately for the jury to decide, based on expert testimony the Court finds to be reliable (as well as lay testimony), which version of events is "correct." *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("[T]he evidentiary requirement of reliability is lower than the merits standard of correctness."); *Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

## ANALYSIS

The Defendant does not contest Dr. Spivack's statement of her experience in the area of examination of children post-mortem to determine the cause of death. Dr. Spivack states that in her nearly six years of experience working with pathologists in examining injured and deceased children with congenital defects or histories of abuse, she has prepared the death certificates of approximately two hundred (200) children. Some of these children died from other than natural causes. She has attended and examined bodies at crime scenes and has observed decomposition of infant tissues during the course of her work. Dr. Spivack has also researched extensively and published works relating to the determination of the cause of death of children. The Court notes

---

[1] "[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

that Dr. Spivack's work is not solely done in preparation for litigation, but that she also analyzes children in a professional capacity unrelated to testifying as an expert witness. In general, as a Board certified pediatrician and through her experience working in conjunction with forensic pathologists, Dr. Spivack is knowledgeable, if not licensed, in the area of forensic pathology.

Dr. Spivack states that her opinions are not only based on her experience in the field, but also on her research in articles and medical reference texts. Defendant's expert, Dr. Ophoven, acknowledged that Dr. Spivack's main textual sourcebook was commonly accepted in the field, though not her preferred source. In fact, some of the Defendant's and Dr. Spivack's resources involved in making conclusions on the cause of the infant's death may overlap; Dr. Spivack claims to be the author of an article referred to by Dr. Ophoven in support of her conclusions.

Defendant also does not contest the examination methods used by Dr. Spivack. The parties agree that Dr. Spivack was present to examine the infant's body soon after his death, has examined some of the circumstances surrounding the infant's death, and has spoken with the emergency medical technicians present soon after the infant's death. Dr. Ophoven agrees with Dr. Spivack's method of determining whether SIDS was the cause of death was proper and concurs in Dr. Spivack's conclusion that the cause of death was properly "undetermined." Dr. Spivack and the Defendant are in agreement that the lividity present on the infant's front is consistent with a diagnosis that the infant died of SIDS.

Apparently, the only area of disagreement between the expert physicians as to cause of death surrounds Dr. Spivack's determinations that positional or intentional asphyxia could be possible diagnoses. According to Dr. Ophoven, a normal, healthy, well-developed infant placed face down will voluntarily move his head to avoid asphyxiation; Dr. Ophoven would categorize

an otherwise healthy infant who did not move his head as a SIDS victim. Dr. Spivack disagrees, stating that asphyxia and SIDS are two distinct diagnoses. Dr. Spivack bases her opinion that the infant may have suffocated because of his position on published scientific literature stating that suffocation based on prone positioning can be diagnosed separately from SIDS. Dr. Spivack also states that intentional asphyxia by pressing the infant's face into a soft surface is a potential cause of death. Dr. Ophoven posits that blood in the nostrils and mouth is characteristic of an asphyxiated infant. However, Defendant does not present affirmative evidence showing that intentional asphyxia is an impossible or scientifically unsound diagnosis, just that SIDS is a potentially better diagnosis.

Similarly, the experts disagree as to whether, regardless of the cause of death, the infant was repositioned after his death and left for a significant amount of time before medical assistance was called. While Defendant and Dr. Spivack disagree as to the extent of lividity which would be present on the infant's back at the time he was examined, both agree that the research and literature on the topic make such determinations persuasive, but unreliable as a sole determinant. As Dr. Spivack has based her opinion on other factors, including the surrounding circumstances of the infant's death and used mixed lividity as a persuasive factor, her method appears to be grounded in proper scientific procedure.

Though the experts have differing opinions as to lividity and the possibility of asphyxiation, the Court finds that Defendant has not adequately attacked Dr. Spivack's research and background to show that her opinions on this matter are incompetent, unreliable, not based

on the scientific method, or unhelpful to a jury.[2]  Dr. Spivack's bases for her opinion are education, training and experience working with certified forensic pathologists and literature reviewed and accepted throughout the medical community.  Neither expert disputes that lividity is a well-documented and thoroughly analyzed and tested medical phenomenon.  Both experts acknowledge the wide potential rate of error.  Dr. Spivack has persuaded the Court that use of lividity as a persuasive factor in determining time and position of death is accepted in the medical and forensic communities.  Therefore, Dr. Spivack's testimony based on her analysis of the infant's lividity is sufficiently reliable to be presented to the jury.  The Court only decides that the evidence may be presented to the factfinder; the jury must decide how much weight and credibility to assign the evidence.

      The Court finds that Dr. Spivack is also qualified to testify as to the cause of death of the infant.  She bases her conclusions on researched, published studies of asphyxiation and SIDS as causes of death.  She concurs with a forensic pathologist, licensed to work in the field, that the death was undetermined.  Her proposed method of diagnosing SIDS, is not only universally accepted in the medical community, but is required by the Center for Disease Control.  While Dr.

---

[2]Defendant, in her Motion for a *Daubert* Hearing (Docket #113) also moves the Court to examine "[w]hether an opinion by Dr. Spivack that the autopsy results were inconsistent with Sudden Infant Death Syndrome (SIDS) meets the Daubert criteria for admissibility as a scientific theory to explain the death of the child in this case."  It appears to the Court that Dr. Spivack has never opined that the autopsy results were inconsistent with a diagnosis of SIDS.  Rather, Dr. Spivack concludes that SIDS and several other causes could not be ruled out because of the autopsy and other factors.  Thus, SIDS is an inappropriate diagnosis as the definitive cause of death, and the cause of death is "undetermined."  As Dr. Spivack has not opined that SIDS is inconsistent with this death, the Court declines to make a finding on the Defendant's request.

Spivack states that some aspects of her conclusion are not methodically testable,[3] the other three *Daubert* factors weigh in her favor. The capacity of a theory to be scientifically tested is not an absolute prerequisite for reliability in expert scientific opinions; it is one of several factors to be considered. Therefore, Dr. Spivack's testimony as to cause of death is sufficiently reliable to be presented to a jury. Of course, the jury must weigh her testimony with the testimony presented by Dr. Ophoven to determine the outcome in this case.

The Defendant's expert's conclusions and other challenges[4] do not convince the Court that Dr. Spivack's testimony is unreliable and without relevance to the jury. *Daubert's* reliability requirement simply does not set a high bar for admissibility of expert testimony. The Court neither examines the strength of Dr. Spivack's conclusions nor compares the reliability of

---

[3] Dr. Spivack asserts that medical science cannot reasonably test whether all infants who do not turn their heads when placed on their stomachs may be diagnosed with SIDS. While scientists might catalogue that some infants turn their heads to seek adequate oxygen and others do not, Dr. Spivack contends that one cannot diagnose an infant with SIDS until after that infant has died.

[4] In further support of her position that Dr. Spivack cannot present reliable evidence on matters of cause of death and the circumstances surrounding the death, Defendant brings to the Court's attention two cases disallowing Dr. Spivack to testify as to certain matters unrelated to her testimony in this case. *McIntire v. Com.,* 192 S.W.3d 690 (Ky. 2006); *Com. v. Davis*, No. 06-CR-00205 (Greenup, Ky., Cir. Ct. 2006). Neither case is binding on this Court. In *Davis*, the Greenup Circuit Court determined that Dr. Spivack, as well as other doctors, was unqualified to testify on Shaken Baby Syndrome because the medical research on Shaken Baby Syndrome pertinent to the case was not yet well-developed enough to be reliable and helpful to a jury. In *McIntire*, the Kentucky Supreme Court allowed Dr. Spivack to testify on medical and forensic issues but did not allow her testify on other issues relating to violent head trauma and child abuse to an infant. The Kentucky Supreme Court held that Dr. Spivack was not competent to testify on psychiatric issues, such as when a person is aware that violence is occurring in his or her household. This Court agrees that "Dr. Spevak [sic] holds impressive qualifications and has extensive experience in the field of forensic pediatrics." *McIntire*, 192 S.W.3d at 697-98. These cases do not persuade the Court that Dr. Spivack is incompetent to testify as to the medical and forensic issues present in this case.

the experts. Rather, the Court examines whether Dr. Spivack has a scientifically grounded and accepted basis for her conclusions. Dr. Spivack's experience in these matters, research, and reliance on published and scientifically accepted literature establishes that her opinion might be helpful to the finder of fact. While it appears that there is scientific merit to both Dr. Spivack's and Dr. Ophoven's conflicting conclusions, the Court does not consider which opinion is more persuasive in order to exclude the other. The finder of fact must determine how much merit each conclusion commands and weigh the opinions appropriately.

## CONCLUSION

The Defendant's Motion to Exclude Dr. Spivack's expert testimony on the grounds of unreliability is **DENIED.** An appropriate order shall issue.